**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

WILLIE SCOTT, III,

                          Plaintiff,

     v.                               No. 06-CV-481
                                       (FJS/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

_____

**APPEARANCES:**                 **OF COUNSEL:**

CONBOY, McKAY, BACHMAN &      LAWRENCE D. HASSLER, ESQ.
     KENDALL, L.L.P.
Attorney for Plaintiff
307 State Street
Carthage, New York 13619

HON. GLENN T. SUDDABY        MARLA PIAZZA SIEGEL, ESQ.
United States Attorney for the Northern  Special Assistant U.S. Attorney
  District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff Willie Scott, III ("Scott") brought this action pursuant to 42 U.S.C. § 405(g),

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

denying his application for benefits under the Social Security Act.  Scott moves for a

finding of disability and the Commissioner cross-moves for a judgment on the pleadings.

_____

    [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Docket Nos. 6, 10.  For the reasons which follow, it is recommended that the Commissioner's decision be affirmed.

## I. Procedural History

On May 5, 2003, Scott filed for disability benefits alleging an onset date of March 6, 2003.  T. 15, 490.[2]  The application was denied on June 20, 2003.  T. 15, 490. Scott requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ Gordon Malick on August 17, 2004.  T. 15, 490.  In a decision dated December 15, 2004, the ALJ held that Scott was not entitled to disability benefits.  T. 21-22.  On January 31, 2005, Scott filed a request for review with the Appeals Council.  T. 10-11.  The Appeals Council denied Scott's request for review on March 28, 2006, thus making the ALJ's findings the final decision of the Commissioner.  T. 6-9.  This action followed.

## II. Contentions

Scott contends that the ALJ erred when he failed to (1) assess properly the severity of Scott's conditions, (2) consider properly the medical opinions and other evidence of record, (3) assess properly Scott's residual functional capacity (RFC), and (4) support his conclusion that Scott could perform other work that exists in the national economy.  The Commissioner contends that there was substantial evidence to support the determination

---

[2] "T." followed by a number refers to the pages of the administrative record filed by the Commissioner.  Docket No. 4.  Additionally, the administrative law judge's decision was duplicated and is available in both the administrative record and as a docket attachment.  T. 12-22; Docket No. 1, pt. 4.  All references to the decision will be made to the administrative record.

that Scott was not disabled.


### III. Facts

Scott is now forty years old and completed high school with a special education degree.  T. 16, 491.  Scott has previously worked "as a hospital transport clerk, cook, security guard, meat cutter, pipe cutter, presser, and substitute teacher's aide, but has performed no gainful activity since March 6, 2003 . . . ."  T. 16, 75, 82-85, 87-93.  Scott alleges disability due to a combination of medical conditions comprised of ankle, knee, back, and neck pain, ingrown toenails, gout, carpal tunnel syndrome, and a learning disability.  Docket No. 6 at 2-11.


### IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.   Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. §

3

423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

4

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V.  Discussion

### A. Medical Evidence[3]

### 1. Right Ankle

Scott has undergone three ankle operations and presents with continuing

complaints of "lingering pain and poor mobility."  T. 121; <u>see</u> <u>also</u> T. 129.  Scott underwent

his first ankle surgery in March 1997 when Samaritan Medical Center ("Samaritan")

performed an "ankle arthroscopy[4] and [a] talar chondral defect microfracture,"[5] removing

multiple loose bodies from Scott's ankle.  T.195, 290-91.  In August, Scott underwent

another surgery to repair dislocated tendons in his ankle.  T. 192.  On December 29, 1997,

during a follow-up appointment with the North Country Orthopedic Group ("NCOG"), the

NCOG discovered another loose body in Scott's ankle which eventually required additional

surgery.  T. 190.  In early March 1998, Scott underwent a "tendon reconstruction as well

as ankle arthroscopic debridement[6] . . . ."  T. 277-79; <u>see</u> <u>also</u> T. 186-87.  Later x-rays

performed by NCOG indicated that the surgeries were successful and that there was "no

---

[3] During the administrative hearing, Scott also testified to two additional medical impairments: liver damage and headaches.  T. 15.  Scott did not discuss these ailments in the brief submitted here.  Those ailments will not, therefore, be addressed.

[4] Arthroscopy is the "[e]xamination or surgical repair of the interior of a joint with an arthroscope . . . . [inserted into the body] using small incisions or portals around the joint." ORTHOPAEDIC DICTIONARY 23 <http://books.google.com> [hereinafter ORTHOPAEDIC DICTIONARY].

[5] "[M]icrofracture surgery is a common technique used to repair damaged . . . cartilage . . ." by drilling small holes, or microfractures, into bone near the damaged cartilage prompting the surrounding bone to make new replacement cartilage.  MEDLINE PLUS - MEDICAL ENCYCLOPEDIA < http://www.nlm.nih.gov/medlineplus/ency/article/ 007255.htm>.

[6] Debridement is "the removal of foreign material and devitalized or contaminated tissue . . . until surrounding healthy tissue is exposed.."  DORLAND'S ILLUSTRATED MED. DICTIONARY 430 (28th ed. 1994) [hereinafter "DORLAND'S"]. .

lysis[7] around the screw."  T. 185.

On April 6, 1999, Scott complained of snapping and popping in his ankle; however, an x-ray of the ankle was unremarkable.  T. 179.  In an attempt to increase comfort, a screw which had been part of the ankle reconstruction was removed from Scott's ankle.  T. 179, 264.  Throughout the rest of the year, Scott attended three follow-up appointments with NCOG where NCOG continually noted that his ankle had an excellent range of motion and that he was suffering from nothing more severe than mild swelling.  T. 174-76.  Additionally, NCOG stated that it was "uncertain what else . . . can [be] offered . . . because [Scott wa]s [not] symptomatic enough to warrant another surgical intervention . . . ."  T. 175.

In April 2000, Scott reinjured his ankle and went to the emergency room for x-rays. T. 172, 255.  The x-rays revealed no fractures and upon NCOG's examination of Scott's ankle, the conclusions came back "quite benign."  T. 172.  Additionally, a month later an NCOG physician indicated that while Scott "is most appropriately given a classification of a permanent partial disability of a moderate degree . . . , [a] scheduled loss of use is not indicated because there is really minimal loss of range of motion of his ankle . . . ."  T. 171.

During 2001, Scott again reinjured his ankle twice and received additional sets of x-rays.  T.166, 168.  On a subsequent appointment with NCOG after the first incident, it was indicated that the x-rays were again unremarkable and that Scott was suffering from a sprain with subsequent treatment to include bracing, rest, and pain relievers.  T. 168.  The later appointment  yielded similar results.  Id.

---

[7] Lysis includes the "disintegration or destruction of a cell or tissue."  ORTHOPAEDIC DICTIONARY 221 *available at* http://books.google.com.

In January 2002, Scott presented at NCOG with continued complaints of pain and soreness.  T. 164-65.  Radiology reports from Samaritan indicated that Scott suffered from "[c]alcifications[8] . . . [and m]ild osteoarthritic[9] changes."  T. 224.  This diagnosis was confirmed on March 6, 2003 when Scott was x-rayed after falling.

On June 19, 2003, Scott underwent a residual functional capacity (RFC) examination by A. Del Nero.  T. 301-306.  Del Nero commented that Scott "was quite dramatic in his presentation . . . ."  T. 032-03.  Del Nero also stated that Scott was not overly cooperative during the evaluation which made Del Nero's ability to  make RFC assessments difficult, and that recent medical records by the orthopaedics indicated that his knee and ankle had been stable.  T. 303.  Del Nero concluded that Scott "[s]eem[ed] capable of performing at least sedentary work."  Id.

Scott fell again in August 2003, and during a follow-up appointment the NCOG stated that although the ankle was swollen, Scott remained able to ambulate independently.  T. 327.  The physician also noted that while Scott used an ankle brace occasionally, he was not wearing it during the examination.  Id.  In September 2003, NCOG concluded that Scott was no longer in need of medical intervention because he was walking well, his ankle was stable, and it retained a full range of motion.  T. 328.  At the end of the month, Scott was seen for an alleged flare-up of pain, but it was again noted that his ankle was not swollen and that his range of motion was intact.  T. 326.  The

---

[8] Calcification is "[t]he deposition of calcium salts or calcareous matter within a tissue or structure."  ORTHOPAEDIC DICTIONARY 46.

[9] Osteoarthritic changes occur as a result of osteoarthritis which is a "noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane . . . accompanied by pain . . . and stiffness . . . ."  DORLAND'S 1199.

conclusion was that Scott suffered from "some degenerative changes in th[e ankle] which seemed to be exacerbated by weather." Id.

## 2. Left Ankle

In April 2000, Scott fell and injured his left ankle. T. 173. Upon examination, it was noted that Scott's ankle was extremely swollen and that he was unable to bear weight on it. T. 173.

On June 19, 2003, Scott underwent an RFC examination with A. Del Nero, who concluded that Scott was capable of performing sedentary work despite his ankle and knee injuries. T. 301-306; see supra subsection V(A)(1). On March 9, 2004, Scott was involved in a motor vehicle accident injuring, among other things, his ankle. T. 404-16. A month later, he returned to NCOG stating that his ankle had given out on him. T. 389. Upon review, NCOG noted that the ankle was not swollen and x-rays indicated that there were neither fractures nor dislocations. Id. NCOG diagnosed Scott with a sprain and recommend that he continue using the air cast he was recently provided by the hospital and the walker he had previously purchased. Id. On April 26, 2004, Scott returned to NCOG stating that his ankle condition had improved tremendously; however, his foot had started to give him trouble T. 386. Upon examination, it was noted that his ankle was unremarkable, with no significant swelling or pain. Id. Additionally, his ankle retained full range of motion. Id. However, there was residual swelling and tenderness with his great toe. Id.

### 3. Left Knee

In December 1998, Scott presented at NCOG with knee aches which had allegedly lasted for months.  T. 182.  X-rays were taken and an MRI was recommended to confirm that there was no meniscus[10] tear.  T.132, 181.  On January 21, 1999, NCOG had a follow-up appointment with Scott and commented that the MRI indicated that his ligaments were intact and there was no sign of a meniscus tear.  T. 181.  Despite the negative MRI, a month later Scott decided to undergo a diagnostic arthroscopy.[11]  T. 180.

On April 15, 1999, Samaritan performed arthroscopic surgery on Scott's knee.  The surgery revealed  "some degenerative changes . . . as well as chondrocalcinosis[12]."  T. 179, 261-62.  During post-surgical follow-ups with NCOG, Scott was once injected with Celestone for bursitis[13] but otherwise had "[no]thing inside his knee . . . that [wa]s giving him troubles."  T. 176-77.

After another knee injury in January 2002, an NCOG physician initially instructed Scott to discontinue his current employment.  T. 135, 161-62.  However, six weeks later, Scott had greatly improved.  He had ceased wearing his knee brace and was discharged from physical therapy with full range of motion in his knee.  T.133, 160.

---

[10]"[O]ne of the crescent-shaped disks of fibrocartilage attached to the superior articular superior surface of the tibia." DORLAND'S 1012..

[11] A "[d]iagnostic arthroscopy refers to a complete joint examination."  ORTHOPAEDIC DICTIONARY 23.

[12] Chondrocalcinosis is "[t]he radiographic . . . evidence of cartilage calcification . . . seen in association with gout, . . . [and] osteoarthritis . . . ."  ORTHOPAEDIC DICTIONARY 60.

[13] Bursitis is the "inflammation of a bursa."  DORLAND'S 240.  A bursa is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop."  Id. at 238.

In September 2002, Scott reinjured his knee again.  T. 157.  After viewing unremarkable x-rays, Scott was recommended to rest, use his knee brace, take pain relievers, and "stay out of work for now."  T. 159.  During his subsequent appointment with NCOG on September 9, 2002, Scott continued to complain of unbearable pain and difficulty walking and sleeping.  T. 164.  However, a few weeks later, Scott reported that he was doing well and the NCOG noted that there was little swelling and good range of motion in the knee.  T. 155.  In October 2002, Scott also underwent an MRI which showed slight degenerative changes but no evidence of a meniscus tear.  T. 339.

During a follow-up with NCOG on June 9, 2003, Scott again complained of pain in his knee.  On this occasion, the physician commented that Scott was in a great deal of pain when moving his knee; however, the knee's strength remained fully intact and the x-rays which were taken "demonstrate[d] no appreciable abnormality, perhaps some subtle degenerative changes."  T. 340.

### 4. Right Knee

On January 30, 2002, Scott was discharged from Samaritan after injuring his right knee.  T. 217.  His discharge plan provided Scott with pain medication and recommended rest, using crutches and a knee brace, and to stay home from work for three days.  T. 217.  The radiology report showed an "essentially negative exam" with a "probabl[e] tiny bone island[14] in the distal femur."  T. 218.  During a follow-up examination with NCOG in early March, Scott reported that he was feeling much better.  T. 135.  Additionally, his range of

---

[14] A bone island is "[a]n asymptomatic bone lesion . . . ."  ORTHOPAEDIC DICTIONARY 38.

motion was full, pain was limited, and there was no evidence of atrophy.  T. 135, 161.  An MRI indicated that both his ligaments and meniscus were in tact and that Scott could return to work.  T. 161.

On June 19, 2003, Scott underwent an RFC examination with A. Del Nero, who concluded that he was capable of performing sedentary work despite his ankle and knee injuries.  T. 301-306; see supra subsection V(A)(1).


### 5. Ingrown Toenails

Due to recurrent ingrown toenails, as a result of Scott's gout, on February 9, 1999, he underwent a Symes amputation[15] at Samaritan.  T. 265-68.  In April 2003, Scott suffered from, and NCOG resolved, a gouty attack of the left toe.  T. 151.  On April 7, 2003, during a follow-up appointment with NCOG, it was noted that the amputations had "healed satisfactorily . . . [with] no evidence of recurrence of [Scott's] nail."  T. 154.

In September 2003, the decision was made with NCOG to pursue a nail ablation[16] for one of Scott's toes because one of his nail beds continued partially to grow despite the previous amputation.  T. 325.  During subsequent appointments with NCOG in October and November, it was documented how successful the ablation was and how well the wound had healed.  T. 324-25.  Although, in December 2003, Scott returned with left toe inflamation, a follow-up appoint a few days later showed that the toe condition was resolved and that the toe was no longer swollen  T. 324.

_____

[15] The terminal Symes amputation removes a portion of the great toe and all adjoining tissues including the "nail plate, nail bed, nail matrix and distal phalanx." Edmonds et. al., Managing the Diabetic Foot 201-02 available at http://books.google.com.
[16] Ablation is the "removal or destruction of a part . . . ." DORLAND'S 4

**6. Gout**[17]

In mid-February 2001, Scott reported a flare-up of gout at work and was placed on various medications.  T. 169.  During a follow-up appointment with NGOC, it was noted that Scott was responding well to the course of treatment.  Id.

In 2002, Scott had at least two discharges from Samaritan for unspecified gout attacks.  T. 211, 220.  Each time Scott was provided with medication and instructed to return for follow-up as needed.  T. 211, 220.  In both 2003 and 2004, Scott had one discharge from Samaritan for an unspecified gout attack.  T. 208, 400.

**7. Back**

In July 2003, Scott began receiving a series of MRIs in response to complaints of back pain.  The first MRI, on July 16, 2003, revealed mild degenerative changes, a small disc bulge, and tear but no herniation, spinal stenosis,[18] or other abnormalities noted.  T. 334.  A month later, during a follow-up with NCOG, it was noted that Scott was experiencing "[b]ack pain, discogenic[19] with some radicular symptoms down his left leg . . . [although n]o obvious nerve root compression [was] noted."  T. 330.  In both August and November, 2003, Scott had cervical spine series performed by Samaritan.  T. 311, 313.

---

[17] Gout is "[a] recurrent acute or chronic arthritis of peripheral joints that results from deposition in and about the joints and tendons of monosodium urate crystals from supersaturated hyperuricemic body fluids."  THE MERCK MANUAL 460 (17th ed. 1999) [hereinafter "MERCK"].

[18] Spinal stenosis, also called central and foraminal narrowing, is spinal canal or foramina constriction resulting in back pain caused by pressure being exerted on the nerve roots.  MERCK 477.

[19] Discogenic "[s]yndromes [are] characterized by local and radicular pain due to nerve root or spinal cord compression, caused by herniation . . . ."  ORTHOPAEDIC DICTIONARY 93.

13

Both sets of MRIs were normal  T. 311, 315.  In December 2003, Scott returned to NCOG complaining of persistent lower back pain and NCOG ordered another MRI.  T. 323.  The MRI "show[ed] normal disc and bone signal[s] . . ." with no "herniation or significant protrusion . . . ."  T. 314.  Additionally, the MRI showed some minor degenerative changes, but again, no evidence of herniation, spinal stenosis or cord compression.  T. 321.

On May 22, 2003, Scott was reviewed by Dr. Gerald Amatucci.  T. 292-300.  Dr. Amatucci concluded that Scott "seemed very dramatic in his presentation" and that examinations of the cervical and thoracic spine were normal with no deformities.  T. 293.  However, examination of the lumbosacral spine was difficult because Scott was uncooperative, making it impossible to assess the range of motion he actually possessed.  Id.  Additionally, Amatucci surmised that Scott's "descriptions of his medical issues were out of proportion to [the] physical findings" and that he was actually only mildly limited in his abilities to stand, lift, and walk.  T. 294.

On January 5, 2004, Scott returned to NCOG complaining of back pain which had persisted for three weeks.  T. 318.  During this examination, it was noted that Scott's range of motion had slightly deteriorated.  T. 320.  Scott was referred for an EMG and nerve conduction studies to attempt to elucidate the cause of the "tingling occurring in his lower back, thoracic spine, cervical spine and arms."  Id.  The medical records do not reflect that these tests were ever completed.

### 8. Neck

In December 2003, Scott underwent an MRI for neck pain.  T. 315.  The results indicated that there were minor degenerative changes but no evidence of herniation,

14

spinal stenosis, or cord compression.  T. 315.  On March 9, 2004, Scott was involved in a

motor vehicle accident and had chief complaints of neck strain and headaches.  T. 404-16.

A spine series was completed and was negative.  T. 412.  A month later, Scott complained

to NCOG of continued neck pain radiating down his upper extremities.  T. 387.  NCOG

also reviewed the previous x-rays performed by Samaritan, concluding that there was "no

gross misalignment in the cervical spine," recommending physical therapy with cervical

traction.  T. 387.


### 9. Carpal Tunnel Syndrome

As a result of the motor vehicle accident on March 9, 2004, Scott was diagnosed

with carpal tunnel syndrome and provided wrist braces.  T. 497.  Due to Scott's back

problems and the motor vehicle accident, Scott alleges that he must now wear the braces

whenever he is driving or sleeping because if he does not, his arms will become numb.  T.

498.  As discussed supra in subsection V(A)(7), NCOG referred Scott to undergo further

confirmatory testing for his carpal tunnel symptoms, but this diagnostic testing does not

appear to have been administered.


### 10. Learning Disability

Scott was placed in special education classes while he attended school.   T. 120.

While Scott had a normal level of intelligence and was able to communicate effectively, he

had difficulty with complex and abstract language.  T. 361, 367.  In Scott's administrative

hearing, it was established that he finished high school reading at a second grade level

and performing math skills at a first grade level.  T. 491.

On April 27, 2004, Scott underwent a Psychiatric Examination and Organicity Evaluation with Dr. Jeanne Shapiro.  T. 371-85.  Shapiro found that Scott was able to think clearly, communicate adequately, and appropriately attend to and concentrate on the conversation.  T. 373. Additionally, Scott was able to count and process simple calculations, attend to his daily hygiene, and drive.  Id.  However, even though Scott was able to pay attention and concentrate, he still required assistance cooking, doing general cleaning, shopping, and managing money.  T. 373-34.  Additionally,  "[h]is ability to read and write [wa]s deficient. . . [and his] ability to perform simple calculations . . . [was] below average."  T. 373-74.

In spite of these limitations, Scott "appear[ed] to be capable of following, understanding, and remembering simple instructions and directions if he d[id] not have to read them himself."  T. 374, 379.  Additionally, Scott could successfully focus and complete tasks, abide by a routine, maintain a schedule, make appropriate decisions, learn new skills, socially interact and properly relate to individuals, and appropriately handle stress.  T. 374, 379-80.  In conclusion, although Scott has a reading disorder which affects his abilities to perform certain tasks, his condition is mild, "[h]e is functioning in the borderline range of intelligence . . . [and he] should be able to work in an appropriate setting in a position that does not require reading."  T. 374, 379-80.

## B. Severity

Scott contends that the ALJ failed properly to assess the severity of his conditions. The Commissioner contends that the ALJ properly evaluated the severity of Scott's

impairments.

As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities.  See subsection IV(A) supra; 20 C.F.R. § 404.1521(a) (2003).  The purpose of the severity analysis is to do no more than "screen out de minimis claims . . . ."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). "If the disability claim rises above the de minimis level, then further analysis is warranted." Dickson v. Comm'r of Soc. Sec., No. 04-CV-1296 (NAM/RFT), 2008 WL 553208, at *5 (N.D.N.Y. Feb. 27, 2008) (citing Dixon, 54 F.3d at 1030).

Where a claimant alleges multiple impairments, a court will consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.  An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs."  Id. § 404.1521.  Basic work activities which are relevant for evaluating the severity of a physical impairment include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. . . ."  Id. § 404.1521(b)(1).  "[A]ge, education, and work experience are not considered in determining the severity of an impairment."  Id. § 416.920(c).

In this case, the ALJ found that "apart from left ankle pain post motor vehicle accident and disc disease of the cervical/lumbar spine, [Scott did] not have any impairment that significantly limit[ed] his ability to perform basic, work-related activities."  T. 20.  Scott claims that the ALJ's failure to acknowledge that his additional medical impairments had a severe impact on his abilities and aptitudes to do most jobs was in

error.  The ALJ explained that Scott's (1) right ankle, while apparently having a flare up of pain in 2003, was documented during the examination as having a full range of motion and being fully-functional, (2) left knee generated unremarkable x-rays, minimal swelling, and mild pain, (3) "gout is occasionally symptomatic [and] the frequency of office visits and emergent treatment . . . are not suggestive of significant limitations," (4) carpal tunnel has never had appropriate diagnostic testing and thus has not been conclusively diagnosed, and (5) learning disability does not render him incapable of working because he is still of substantial intelligence, able to perform simple calculations and computations, and has a requisite base of employment knowledge to draw upon based on past experience.  T. 19-20.

In this case, the medical record indicates that Scott has sought treatment for his joints on multiple occasions.  It is undeniable that Scott has had serious problems with his right ankle.  However,  the record clearly supports that since 2002, Scott has only been suffering from mild degenerative changes which are inflamed by the weather, the range of motion in his ankle is good, and, while he has an ankle brace at his disposal, he is capable of and chooses to ambulate independently.  T. 326, 224, 338, 154, 164-65, 328, 327. Moreover, as early as May 2000, NCOG concluded that while Scott has "a . . . partial disability of a moderate degree . . . , scheduled loss of use is not indicated because there is really minimal loss of range of motion . . . ."  T. 171 (emphasis added). Additionally, the record and the ALJ's findings clearly indicate that Scott's left knee has undergone some degenerative changes, yet his strength is intact and there are "no appreciable abnormalit[ies] . . . ."  T. 340, 339, 155.

Scott's right knee was even less affected, exhibiting full range of motion, limited

pain, and normal MRI results.  T. 218, 135, 161.  Furthermore, during Scott's March 2002

follow-up with NCOG, the physician indicated that it was appropriate for Scott to return to

work.  T. 161.  Scott has demonstrated that he can and does ambulate independently.

Additionally, Scott's treating physicians have recommended that he return to work and only

diagnosed him with a partial disability because his range of motion is still intact.

Therefore, while Scott's conditions may be aggravating, there is substantial evidence to

support the finding that, even in combination, the mild arthritis affecting Scott's joints is not

severe because it does not significantly impair his abilities and aptitudes to engage in

basic work activities.

The ALJ also stated that Scott's transient gout attacks and ingrown toenails did not

qualify as a severe impairment which would preclude basic work activities.  The medical

record supports this contention because in 2001 and 2002, during his tenure as a physical

therapy aide and substitute teacher's assistant and prior to his admitted cessation of

gainful employment, Scott continued to work despite his gout.  T. 82, 490.  Additionally,

each medical entry indicates that his gout conditions were successfully managed with diet

and medication and that his ingrown toenails were resolved with the Symes amputation

and nail ablation.  Thus, the ALJ's decision that neither of these ailments, in conjunction

with the others listed, constituted a severe impairment is supported by substantial

evidence in the record.

Additionally, the ALJ concluded that the lack of confirmatory testing concerning

Scott's carpal tunnel precluded it from being, alone or in combination, a severe

impairment.  Scott contends that his diagnosis on April 12, 2004 stating that his

"complain[ts] of waking up with tingling in his hands . . . [is] indicat[ive of] . . . at least some

19

carpal tunnel component . . ." and is sufficient, when considering his additional conditions, to present a severe impairment.  T. 388.  An "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508 (2003). "A physical . . . impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."  Id.  However,

> [i]n the absence of a medical opinion . . . it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . .  [because w]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician . . . .

Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotations and citations omitted).

In this case, Scott alleges that because he was assessed as having some form of carpal tunnel syndrome, the ALJ did not correctly base his decision on the record because (1) he had no contrary medical opinion with which to disagree with the diagnosis and (2) the ALJ is unable to substitute his own judgment for Dr. Baird's competent medical opinion merely because additional confirmatory testing was not completed.  However, the medical evidence does not establish that this impairment was sufficiently severe to preclude his ability to perform basic work functions.  Without the confirmatory diagnostic testing, Dr. Baird did not and could not determine the severity of the condition.  He could only determine that it was probably present and a contributing factor to the tingling and numbness.  However, even though the condition was present, it had not impaired or inhibited Scott's ability to perform basic work functions.  This was demonstrated by his

sustained fine motor skills and ability to perform independently his activities of daily living as he could still dress, bathe, groom, and drive.  T. 388, 373.  Additionally, even if this condition were included with Scott's ankle and back pain as discussed <u>infra</u>, based on his level of sustained function, the impairment was still not sufficiently severe to deprive Scott of  the ability  to perform  work in the national economy.

The ALJ's determination that Scott did not have a severe impairment due to his learning disability, borderline intellectual functioning, is incorrect.  First, the ALJ improperly utilized Scott's previous work experience to justify his decision.  Second, the ALJ's reasoning is not supported by case law.  <u>Neal ex. rel. Walker v. Barnhart</u>, 405 F.3d 685, 689 (8th Cir. 2005) (finding plaintiff not disabled but concluding that borderline intellectual functioning, where plaintiff had "a marked limitation in acquiring and using information . . . [because he] had difficulty comprehending certain information and verbal instructions . . . [and] functioned at a second grade level in reading and mathematics and at a first grade level in written language . . ." was a severe impairment); <u>Williams v. Comm. of Soc. Sec.</u>, 462 F. Supp. 2d, 411, 413 (W.D.N.Y. 2006) (holding that plaintiff with a learning disability and borderline intellectual functioning had a severe impairment).  Third, it cannot be said that the inability to read would only have a minimal effect on the ability to understand and carry out instructions.  While applying the full rationale of <u>Williams</u> may ultimately lead to the conclusion that Scott is not disabled, the ALJ was wrong in determining that his learning disability does not qualify as a severe impairment impinging on his ability to perform basic work functions.

This error does not vitiate the ALJ's ultimate determination, however.  As discussed <u>infra</u> in subsectionV(D), there exists substantial evidence supporting the ALJ's finding that

Scott retained the RFC to perform a significant number of jobs in the economy even with an accurate assessment of the severity of Scott's learning disability.  Accordingly, the ALJ's determination in this regard should be affirmed.

## C. Treating Physician's Rule

Scott contends that the ALJ erred when he failed to incorporate more of his medical history into the decision and give greater weight to the prior comments Scott's treating physician's rendered on his capacity for work. The Commissioner contends that the ALJ's decision is properly supported by substantial evidence in the medical record including, but not limited to, the opinions of Scott's treating physicians.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2003); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the

opinion's consistency with the record as a whole; (iv) whether the opinion is from a

specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503.  If other evidence in

the record conflicts with the opinion of the treating physician, this opinion will not be

deemed controlling or conclusive, and the less consistent the opinion is, the less weight it

will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final

determination of disability and a claimant's inability to work rests with the Commissioner.

Id. at 133-34; see 20 C.F.R. §§ 404.1527(e), 416.927(e) (2003).

    As a whole, Scott received most of his continuing treatment from NCOG and

Samaritan. Even when taking into consideration Scott's entire medical history, the opinions

of these treating physicians, bolstered by radiology results and the disability

determinations of the State, are consistent with the ALJ's findings.  Scott points to six

instances from his medical history, ranging from 1996 to 2002, citing opinions that due to

his wrist, ankle, and knee conditions, he should have been subjected to work limitations.

Docket No. 6 at 21.  While a medical history is important to illustrate the progression of the

alleged disability, the medical record here is replete with instances during and after 2002

when Scott's joints were properly working, rendering Scott unimpaired.  T. 293 (Amatucci

stating he had normal range of motion in his wrist and hands); T.164, 165, 328, 326

(NCOG notes from January 2002 until September 2003 indicating that the right ankle had

a good range of motion, stability, and minimal swelling); T. 386 (treatment notes from 2004

after recuperating from an ankle sprain indicating that Scott's ankle looked "benign" and

felt good); T. 157, 159, 164, 339, 340 (NCOG notes and radiology results from September

2002 and June 2003 indicating good range of motion and "no appreciable [knee]

abnormalit[ies] . . ." despite Scott's complaints otherwise); T. 135, 161 (NCOG treatment

notes and radiology reports post-right knee sprain indicating a full range of motion and no

ligament or meniscus tears).  These dates immediately prior to and after the alleged onset

date comprise the best picture of Scott's alleged disability.  Only considering those dates

preceding subsequent corrective surgeries is inappropriate and misleading.

Thus, the ALJ's decision in this regard should be affirmed as it is properly

supported by substantial medical evidence in the record.


**D. RFC**

Scott contends that substantial evidence does not support the ALJ's findings

regarding his RFC.

RFC describes what a claimant is capable of doing despite his or her impairments

considering all relevant evidence, which consists of physical limitations, symptoms, and

other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d

145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC,

the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory

statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at

150.  RFC is then used to determine whether the claimant can perform his or her past

relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir.

1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

Here, the ALJ determined that Scott could lift or carry twenty pounds occasionally

and ten pounds frequently, could sit, stand or walk as needed by the job, and required the

"opportunity to change postural position at 30-minute intervals."  T. 20.  This finding

echoed the medical opinions of Scott's treating physicians and disability review physicians.

24

With regard to his right ankle, in June 2000, Scott was informed that "he [was] not capable of performing labor . . . ."  T. 122.  However, after his reconstructive surgeries in the Spring and Fall of 1999, Scott was noted as having excellent range of motion in his ankle.  T. 176, 174.  Additionally, in May 2000, one of his treating physicians wrote that while Scott may have "a permanent <u>partial</u> disability [it is] of a <u>moderate</u> degree . . . [and a] schedule loss of use [of the ankle] is <u>not</u> <u>indicated</u> . . . ."  T. 171 (emphasis added).  Thus, his retention of an RFC which was slightly diminished was fully supported by his treating physicians.  Additionally, while early knee examinations[20] led to the conclusion that "he [was] disabled from doing his <u>normal</u> job" and that he should temporarily stay out of work, by June 2003, his treating physicians were noting that his knee showed "no appreciable abnormality . . . ."  T. 135, 159, 340.  Moreover, these statements Scott references which limited his ability to perform the duties demanded while he was employed in his past occupations are echoed by the ALJ, who stated that Scott's "limitations do not allow him to perform the <u>full</u> range of work at the light or sedentary levels of exertion . . . ."  T. 22.  However, simply because Scott could not perform his normal job and perform the full range of his past work does not render the ALJ's RFC determinations inaccurate or unsupported as the ALJ accounted for Scott's diminished abilities.

Scott also contends that due to his back pain, he could not sit or stand for any appreciable amount of time in the day.  However, this contention was not accepted by the ALJ nor supported by the medical evidence.  Scott received six MRIs of his back, all of

---

[20] Scott's right knee records, which are limited, indicate that immediately after his sprain, he was instructed to take three days off from work.  T. 217.  However, during a follow-up with NCOG a month later, Scott was given a clean bill of health and it was recommended he return to work.  T. 161.

which were classified as normal with mild degenerative changes but no stenosis or

narrowing.  T. 337, 311, 313, 314, 315, 386, 412.  Moreover, examinations by the disability

review physicians indicated that Scott was overly dramatic and uncooperative, making it

extremely difficult or impossible to determine his limitations.  T. 293-94, 302-03.

Additionally, the ALJ's determination of Scott's functional limitations were supported by Del

Nero, who explicitly used his own findings and the information in the medical record, to

determine Scott's exertional limitations to be "occasionally lift[ing] a maximum of twenty

pounds, frequently lifting ten pounds, stand[ing] and or walk[ing] at least two hours of [the]

workdays, sit[ting] about six hours a day, and no limitations pulling or pushing."  T. 302.

Lastly, Scott appears to contest  the validity of the finding of his functional capacity

with regard to his learning disability.  The ALJ determined that Scott "retain[ed] the RFC to

perform work at the light level . . . that does not require following written instructions . . . ."

T. 22.  Any insinuation that Scott's difficulty in reading and math would preclude him from

working at the light level, or any exertional level, is incorrect because

> Where a person's only impairment is mental [and] is not of listing
> severity, ... the final consideration is whether the person can be
> expected to perform unskilled work. The basic mental demands of
> competitive, remunerative, unskilled work include the abilities (on a
> sustained basis) to understand, carry out, and remember simple
> instructions; to respond appropriately to supervision, coworkers,
> and usual work situations; and to deal with changes in a routine
> work setting.

Williams, 462 F. Supp. 2d at 414 (citing Social Security Ruling 85-15, 1985 WL 56857

(S.S.A.).

As noted in Scott's psychiatric examination, his thinking was coherent, his ability to

pay attention and concentrate was intact, his social interactions were appropriate, his

ability to communicate was adequate, he could successfully perform simple and complex tasks, he could regularly attend to a routine, maintain a schedule, make appropriate decisions, learn new skills, and he was able to deal with stress.  T. 373, 374, 379.  Thus, Scott's skills were completely adequate to perform unskilled work as he could understand, carry out, and remember simple and complex instructions.  Additionally, Scott's social interaction skills would allow him to interact and respond appropriately to supervisors and co-workers as well as maintain a routine and handle the stress of the work place. As in Williams, "[t]he medical evidence of record supports the conclusion that [Scott's learning disability] does not have a significant effect on the range of possible unskilled work [he] could perform."  Williams, 462 F. Supp. 2d at 414.  Thus, the ALJ's decision that Scott still retained the RFC to perform work is supported by substantial evidence.

Scott also contends that even though the ALJ correctly recognized that he had no past work experience, his decision that Scott could still work in the national economy was not supported by substantial evidence because the Commissioner did not "show that there are other jobs existing in significant numbers in the national economy which [Scott could] perform consistent with his medically determinable impairments, functional limitations, age, education, and work experience."  T. 21.  As previously discussed, once an individual is determined to have a severe impairment, it is the burden of the Commissioner to prove that "an individual . . . could still perform work which exists in significant numbers in either the region where the plaintiff lives or in several regions of the country."  Wright v. Chater, 969 F. Supp. 143, 148 (W.D.N.Y. 1997) (citing 42 U.S.C. § 423(d)(2)(A)).  If only "[i]solated jobs . . . exist [in] very limited numbers in relatively few locations outside of the region where [the plaintiff] live[s, it is] not considered work which exists in [significant numbers in]

27

the national economy." Id. (internal quotations and citations omitted).

At the hearing, the ALJ asked the vocational expert if there was a job suitable for a younger individual who had graduated with a special education degree and had diminished reading, writing and mathematical proficiency, had varied past work experience, suffered from multiple types of joint pain, and would require special accommodations in an employment environment probably only being capable of working under sedentary conditions. T. 510. The vocational expert surmised that while those conditions resulted in a limited work base, it was also "viable . . . [with] work as an assembler . . . and work as a packer." T. 511. The assembler has 2,500 jobs regionally and 50,000 nationally and the packer has 1,200 jobs regionally and 7,300 jobs nationally. This totals 3,700 jobs which are regionally available to Scott, which constitutes a significant number of jobs in the economy. See Wright, 969 F. Supp. at 148 (holding that a combined total of "approximately 1,700 jobs in the . . . region . . . potentially available to an individual with the vocational characteristics of the plaintiff is . . . a significant number.")

Scott also contends that he is unable to work at these alternate jobs because of his medical conditions. Specifically, when the vocational expert was asked about the consequence of Scott's alleged inability to use his hands and wrists in contemplating the occupational base, the vocational expert testified that this development "would abolish any potential occupational base." T. 512. However, as discussed supra in subsection V(B), Scott's carpal tunnel syndrome does not present a serious medical condition. Additionally, even if it was a severe ailment, his current level of ability as established by Scott's testimony reveals that his sustained functionality is far greater than that hypothesized by the ALJ. As the ALJ properly concluded, based on substantial medical evidence, Scott

had not lost the ability to use his hands and wrists; thus, this hypothesis is extreme and inapplicable.

Accordingly, it is recommended that the Commissioner's determination in this regard be affirmed.


### VI. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the decision denying disability benefits be **AFFIRMED**, Scott's motion for a finding of disability (Docket No. 6) be **DENIED**, and the Commissioner's cross-motion (Docket No. 10) be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED:  March 31, 2008
        Albany, New York

_David R. Homer_
United States Magistrate Judge